Blake PARKER, on his own behalf and on behalf of all others similarly situated, and National Organization of Social Security Claimants Representatives (NOSSCR), Plaintiffs,

v.

Jo Anne B. BARNHART,[1] Commissioner of Social Security, and David M. Walker, Comptroller General of the United States, Defendants.

No. C 01–3044–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Dec. 6, 2001.

---

1. This suit was brought against Larry G. Massanari as Acting Commissioner of Social Security. However, on November 14, 2001, Jo Anne B. Barnhart was sworn in as the new Commissioner of Social Security. At the oral arguments in this matter on November 28, 2001, the parties agreed that Jo Anne B. Barnhart should be substituted for defendant Larry G. Massanari pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and the court so ordered.

Thomas A. Krause, Max Schott & Associates, PC, Des Moines, IA, Roxanne Bar-

ton Conlin, Roxanne Conlin & Associates, Des Moines, IA, for plaintiffs.

Martha A. Fagg, U.S. Attorney's Office, Sioux City, IA, Richard G. Lepley, U.S. Department of Justice, Washington, DC, Peter Robbins, U.S. Department of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS; PLAINTIFFS' MOTION TO STRIKE; AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................ 923
  A. Factual Background .............................................. 923
    1. Statutory framework ......................................... 923
    2. "Ticket to Work Act" amendments ............................. 923
      a. Authorization of a "user fee" ............................. 923
      b. Mandate for a GAO study .................................. 925
    3. Announcement of the 2001 "user fee" ......................... 925
    4. The GAO Report ............................................. 926
  B. Procedural Background .......................................... 927
    1. The Complaint .............................................. 927
    2. The parties' motions ....................................... 928
      a. The defendants' motion for summary judgment and judgment
        on the pleadings ........................................ 928
      b. The plaintiffs' motion to strike .......................... 929
      c. The plaintiffs' cross-motion for partial summary judgment ...... 929

II. LEGAL ANALYSIS ..................................................... 930
  A. Standards For Summary Judgment ................................. 930
    1. Requirements of Rule 56 ..................................... 931
    2. The parties' burdens ....................................... 931
  B. The Crux Of The Matter ......................................... 932
  C. The "Takings Claim" ............................................ 934
    1. Arguments of the parties ................................... 934
    2. The controlling authority .................................. 935
    3. Analysis in light of controlling authority ................. 936
      a. Purpose of the "user fee" ................................ 936
      b. Does reality belie the stated purpose? ................... 937
        i. Are the "user fees" used to pay costs or benefits? ....... 937
        ii. Is the "user fee" reasonably related to or a fair approximation of costs? ......................................... 939
        iii. Is Sperry otherwise distinguishable? ................... 940

III. CONCLUSION ................................................941

Distressed by imposition of a 6.3% "user fee" for 2001 on attorney fee awards for successful claimants pursuant Title II and Title XVI of the Social Security Act, a national organization of claimants' representatives and a representative of a prospective class of attorneys filed this action asserting a claim for mandamus and claims pursuant to the Administrative Procedures Act (APA), the "Little Tucker" Act, the "takings" clause of the Fifth Amendment to the United States Constitution, and the Freedom of Information Act (FOIA). In their motion challenging the plaintiffs' claims, the defendants seek judgment on the pleadings on the mandamus and FOIA claims, primarily on the ground that those claims are moot, and summary judgment on the remaining claims. In their response and cross-motion for partial summary judgment, the plaintiffs concede that the mandamus and FOIA claims are moot, but contend that they, not the defendants, are entitled to summary judgment on their "takings" and "APA" claims, and that genuine issues of material fact preclude summary judgment on their "Little Tucker Act" claim, if that claim is not subsumed by a successful "takings" or "APA" claim. In addition, the plaintiffs have moved to strike several of the affidavits offered by the defendants in support of their motion for summary judgment. Thus, the court is asked to determine not only the merits of the parties' cross-motions for summary judgment, but what evidence may be considered in support of those motions.

## I. INTRODUCTION

### A. Factual Background

#### 1. Statutory framework

Title II of the Social Security Act provides for disability, survivors, and retire-ment insurance benefits, *see* 42 U.S.C. §§ 401–33, while Title XVI provides benefits to aged, blind, and disabled persons with limited income and resources. *See id.* at §§ 1381–83d. The Social Security Act permits claimants to have an attorney (or other representative) represent them in administrative proceedings. *See* 42 U.S.C. § 406(a)(1). When the Commissioner makes a determination favorable to a claimant who was represented by an attorney, the Commissioner is required to "fix (in accordance with the regulations prescribed pursuant to the [statute]) a reasonable fee to compensate such attorney for the services performed by him in connection with such claim," unless the claimant has a fee agreement with the attorney that meets certain requirements, in which case, the Commissioner must instead "approve" the fee agreement. *See* 42 U.S.C. § 406(a)(1) & (a)(2)(A).

#### 2. "Ticket to Work Act" amendments

##### a. Authorization of a "user fee"

In 1995, the Social Security Administration (SSA) proposed that it be allowed to discontinue the attorney fee regulation process, estimating that the agency would thereby save $20 million in administrative costs annually. In response, in 1999, pursuant to the "Ticket to Work Act," *see* Ticket to Work and Work Incentives Improvement Act of 1999, Pub.L. 106–170, Congress amended the Social Security Act to impose an "assessment" on attorney fees in order to recoup the administrative costs associated with the attorney fee certification and regulation process. *See* 42 U.S.C. § 406(d)(1).[2] Both the plaintiffs

---

2. The pertinent provision, in its entirety, provides as follows:

    (d) Assessment on attorneys
       (1) In general

and the defendants describe this "assessment" as a "user fee." For calendar years before 2001, Congress set the "user fee" at 6.3% of the attorney fee award, and for years after 2000, directed that the SSA set the "user fee" at "such percentage rate as the Commissioner determines is necessary in order to achieve full recovery of the costs of determining and certifying the fees to attorneys from the past-due benefits of claimants, but not in excess of 6.3 percent." 42 U.S.C. § 406(d)(2)(B). Thus, the "user fee" for 2001 and subsequent calendar years is "capped" at 6.3%.[3]

The statute authorizes assessment of this "user fee" on attorney fees awarded by the Commissioner following an award of benefits in the administrative process, as provided in § 406(a), *and* on attorney fees awarded by a court upon the rendering of a judgment favorable to a claimant, pursuant to § 406(b). *See* 42 U.S.C. § 406(d)(1) ("Whenever a fee for services is required to be certified for payment to an attorney from a claimant's past-due benefits pursuant to subsection (a)(4) or (b)(1), the Commissioner shall impose on the attorney an assessment in accordance with paragraph (2)."). However, at oral arguments, the parties agreed that the "user fee" is in fact assessed almost exclusively against attorney fees awarded by

> Whenever a fee for services is required to be certified for payment to an attorney from a claimant's past-due benefits pursuant to subsection (a)(4) or (b)(1), the Commissioner shall impose on the attorney an assessment calculated in accordance with paragraph (2).
>
> (2) Amount
>
> (A) The amount of an assessment under paragraph (1) shall be equal to the product obtained by multiplying the amount of the representative's fee that would be required to be so certified by subsection (a)(4) or (b)(1) before the application of this subsection, by the percentage specified in subparagraph (B).
>
> (B) The percentage specified in this subparagraph is—
>
> (i) for calendar years before 2001, 6.3 percent, and
>
> (ii) for calendar years after 2000, such percentage rate as the Commissioner determines is necessary in order to achieve full recovery of the costs of determining and certifying fees to attorneys from the past-due benefits of claimants, but not in excess of 6.3 percent.
>
> (3) Collection
>
> The Commissioner may collect the assessment imposed on an attorney under paragraph (1) by offset from the amount of the fee otherwise required by subsection (a)(4) or (b)(1) to be certified for payment to the attorney from a claimant's past-due benefits.
>
> (4) Prohibition on claimant reimbursement

> An attorney subject to an assessment under paragraph (1) may not, directly or indirectly, request or otherwise obtain reimbursement for such assessment from the claimant whose claim gave rise to the assessment.
>
> (5) Disposition of assessments
>
> Assessments on attorneys collected under this subsection shall be credited to the Federal Old–Age and Survivors Insurance Trust Fund and the Federal Disability Insurance Trust Fund, as appropriate.
>
> (6) Authorization of appropriations
>
> The assessments authorized under this section shall be collected and available for obligation only to the extent and in the amount provided in advance in appropriations Acts. Amounts so appropriated are authorized to remain available until expended, for administrative expenses in carrying out this subchapter and related laws.
> 42 U.S.C. § 406(d).

**3.** At oral arguments, counsel for the plaintiffs pointed out that, on November 16, 2001, a bill was introduced in the House of Representatives, House Bill No. 3332, which would, *inter alia*, amend 42 U.S.C. § 406(d) to cap the "user fee" at 6.3% or $100, whichever is less. *See* House Bill No. 3332, 107th Cong., 1st Sess. This $100 "cap on the cap" should be compared to the GAO's estimate that the average "user fee" at the 6.3% cap is $176. *See* Plaintiffs' Appendix at 48 (GAO Report at 16 n. 18).

the Commissioner in the administrative process, whereas the vast majority of attorney fees awarded by a court in Social Security cases are awarded pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, and such a court-ordered award of attorney fees pursuant to the EAJA is not subject to the "user fee" in § 406(d).

### b. Mandate for a GAO study

Another provision of the "Ticket to Work Act" mandated a study and report to Congress by the Comptroller General of the United States, General Accounting Office (GAO), that would examine the SSA's costs of administering the attorney fee certification and payment process. *See* Pub.L. 106–170, Title IV, § 406(c), Dec. 17, 1999, 113 Stat.1912; *see also* 42 U.S.C. § 406, Note, GAO Study and Report.[4] The GAO's study and report were to be

completed one year after enactment of the "Ticket to Work Act," that is, by December 17, 2000. *Id.* However, the GAO's Report was not actually submitted by the deadline. *See* Plaintiffs' Appendix at 30–63 (GAO Report). Thus, the GAO's Report was not considered by the SSA prior to its publication of notice of the percentage rate for the 2001 assessment.

### 3. Announcement of the 2001 "user fee"

On January 19, 2001, the SSA published a notice of the "Rate for Attorney Fee Assessment Beginning in 2001," written by Yvette S. Jackson, Deputy Commissioner for Finance, Assessment and Management, dated January 16, 2001. *See* 66 Fed.Reg. 5521 (Jan. 19, 2001); *see also* Plaintiffs' Appendix at 1. The "Summary" section of the notice stated the following:

---

4. Pub.L. 106–170, Title IV, § 406(c), Dec. 17, 1999, 113 Stat.1912, provided that:

(1) Study.—The Comptroller General of the United States shall conduct a study that—

(A) examines the costs incurred by the Social Security Administration in administering the provisions of subsection (a)(4) and (b)(1) of section 206 of the Social Security Act (42 U.S.C. 406) and itemizes the components of such costs, including the costs of determining fees to attorneys from the past-due benefits of claimants before the Commissioner of Social Security and of certifying such fees;

(B) identifies efficiencies that the Social Security Administration could implement to reduce such costs;

(C) examines the feasibility and advisability of linking the payment of, or the amount of, the assessment under section 206(d) of the Social Security Act (42 U.S.C. 406(d)) to the timeliness of the payment of the fee to the attorney as certified by the Commissioner of Social Security pursuant to subsection (a)(4) or (b)(1) of section 206 of such Act (42 U.S.C. 406);

(D) determines whether the provisions of subsection (a)(4) and (b)(1) of section 206 of such Act (42 U.S.C. 406) should be applied

to claimants under title XVI of such Act [subchapter XVI of this chapter] (42 U.S.C 1381 et seq.);

(E) determines the feasibility and advisability of stating fees under section 206(d) of such Act (42 U.S.C. 406(d)) in terms of a fixed dollar amount as opposed to a percentage;

(F) determines whether the dollar limit specified in section 206(a)(2)(A)(ii)(II) of such Act (42 U.S.C. 406(a)(2)(A)(ii)(II)) should be raised; and

(G) determines whether the assessment on attorneys required under section 206(d) of such Act (42 U.S.C. 406(d)) (as added by subsection (a)(1) of this section) impairs access to legal representation for claimants.

(2) Report.—Not later than 1 year after the date of the enactment of this Act [Dec. 17, 1999], the Comptroller General of the United States shall submit a report to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate on the study conducted under paragraph (1), together with any recommendations for legislation that the Comptroller General determines to be appropriate as a result of such study. *See* 42 U.S.C. § 406, Note, GAO Study and Report.

The Social Security Administration is announcing that the attorney-fee assessment rate under section 206(d) of the Social Security Act, 42 U.S.C. § 406(d), for 2001 is 6.3 percent.

*Id.* In the "Supplementary Information" section of the notice, in addition to a summary of the statutory authority for and provisions governing the assessment under the "Ticket to Work Act," the SSA provided the following information concerning determination of the assessment percentage for 2001:

The Commissioner of Social Security has determined, based on available data, that the current rate of 6.3 percent will continue. We based our decision to continue the 6.3 percent assessment rate on work sampling and management information data for performing these functions. We are continuing to review our data to determine if a change is appropriate subsequently.

*Id.* No estimates of the actual cost to the SSA of attorney fee processing or what percentage of total attorney fees such costs represented in past years were included with the SSA's notice of the assessment rate for 2001.

However, the defendants have submitted as Exhibit B in their Appendix in Support of Their Motion for Summary Judgment and for Judgment on the Pleadings an eight-page administrative record certified by the SSA as consisting of the documents "used ... to calculate the attorney fee payment rate for 2001 as mandated by P.L. 106–170." That record reflects that, based on work sampling techniques, in fiscal year 2000, two of the four major components of the SSA, the Office of Disability and International Operations (ODIO) and the Program Service Centers (PSCs), "spent $85.5 million to process decisions rendered by the Office of Hearings and Appeals" and "[o]ver 47% of the total was

spent to process attorney fee payments and collect the user fee." Exhibit B at 2. Thus, "[t]he cost of the ODIO and PSCs attorney fee work is 7.7 percent of the total fee payments to the attorneys," based on total attorney fee payments of $519 million. *Id.* at 2–3. The record includes the caveat that "this calculation represents costs for ODIO and OPSC [sic]. It should be higher once [Office of Hearings and Appeals (OHA) ], field office and support costs are included." *Id.* at 3. Pages 4 through 8 of the administrative record are numerical summaries of the work sampling. *Id.* at 4–8.

### 4. The GAO Report

The GAO Report, due by December 17, 2000, was ultimately filed on June 29, 2001, several months after the SSA announced the assessment rate for 2001—and more than two months after this suit was filed. *See* Plaintiffs' Appendix at 30*ff* (GAO Report). The GAO Report identifies the SSA's estimates of attorney fee payments and administrative costs, but also indicates that the GAO disagreed with the SSA's estimates. *See* Plaintiffs' Appendix at 34–35 (GAO Report at 2–3). In pertinent part, the "Results in Brief" section of the GAO Report includes the following:

Although SSA's administrative costs serve as the benchmark for the user fee, precise measurement of these costs is difficult. The fee services are only a small part of SSA's operations, and SSA's information systems do not routinely track the type of data necessary for careful measurement of these costs. SSA recently estimated that it cost $54 million to process attorney fees in 2000—about 10.5 percent of the total fees of $512 million paid to attorneys in that year. Our review of this estimate indicated that it was likely too high. However, because data limitations and uncertainty as to what costs should be

counted made exact correction impractical, we attempted instead to calculate a rough "lower bound" for the amount of these costs. This analysis set the lower bound for SSA's administrative costs at $35.4 million, or about 6.9 percent of total attorney fees, exceeding the 6.3 percent threshold of the user fee.

*Id.*[5] Thus, both the SSA's estimates and the GAO's "lower bound" estimates indicated that the "percentage rate" for the "user fee" that would be "necessary in order to achieve full recovery of the costs of determining and certifying the fees to attorneys from the past-due benefits of claimants" was in excess of the statutory cap of 6.3 percent. *See* 42 U.S.C. § 406(d)(2)(B)(ii). The plaintiffs contend that, according to the GAO, the 6.3% "user fee" results in an average "user fee" of $176. *See* Plaintiffs' Appendix at 48 (GAO Report at 16 n. 18).

### B. Procedural Background

### 1. The Complaint

This lawsuit challenging the "user fee" for 2001 was filed in the interim between the Commissioner's notice of the assessment for 2001 and the submission of the GAO's Report. On April 20, 2001, plaintiffs Blake Parker, on his own behalf and on behalf of a class of similarly situated persons, and the National Organization of Social Security Claimants Representatives (NOSSCR), filed the present lawsuit against the Commissioner of Social Security and the Comptroller General of the United States, challenging the SSA's determination of the "user fee" for 2001 and the Comptroller General's failure to produce the study and report on the SSA's costs of processing attorney fees mandated by the "Ticket to Work Act."

More specifically, in their First Claim for Relief—the "mandamus claim"—which the plaintiffs asserted pursuant to 28 U.S.C. § 1361 and section 406(c) of the "Ticket to Work Act," Pub.L. 106–170, the plaintiffs alleged that the Comptroller General had failed to submit the report required by the "Ticket to Work Act"; they therefore sought relief "in the nature of mandamus" pursuant to 28 U.S.C. § 1361 compelling the Comptroller General to issue such a study and report. As noted above, the GAO subsequently produced the report at issue in this claim, but not until June 29, 2001. The plaintiffs concede that this claim is now moot. In their Second Claim for Relief—the " 'Little Tucker Act' claim"—which is brought pursuant to 28 U.S.C. § 1346(a)(2) and 42 U.S.C. § 406(d), the plaintiffs allege that the Commissioner of the SSA has not properly calculated or assessed the "user fee," resulting in damages of less than $10,000 for an individual claim to Parker and class members; the plaintiffs therefore seek compensation for such damages. In their Third Claim for Relief—the "Administrative Procedures Act (APA) claim"—which is brought pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702, the plaintiffs allege that the Commissioner's calculation and assessment of the "user fee" for 2001 is in violation of his duties under 42 U.S.C. § 406(d), in that the user fee is excessive, has no basis in fact, is

---

**5.** The SSA estimates referred to here apparently represent calculation based on more complete figures than are reflected in the administrative record, as discussed above in reference to the SSA's announcement of the assessment percentage for 2001, because the estimated total of attorney fee payments for 2000 is different, as is the cost as a percent of attorney fee payments. *See* Defendants' Appendix in Support of Their Motion for Summary Judgment and for Judgment on the Pleadings, Exhibit B at 3. In addition, the GAO Report states that the SSA estimated the cost of attorney fee processing at $54 million, presumably for all components of the SSA, while the administrative record reflects costs of attorney fee processing for the ODIO and PCSs only at just over $40 million.

arbitrary and capricious, and is an abuse of discretion; they therefore ask the court (1) to declare the assessment for 2001 to be excessive, arbitrary, capricious, and an abuse of discretion, (2) to enjoin the Commissioner from using the assessment announced on January 19, 2001, (3) instead to order the Commissioner to determine a "proper" assessment for 2001, and (4) to order the Commissioner to redetermine all fees for 2001 accordingly. In their Fourth Claim for Relief—the "takings claim"—the plaintiffs assert that the Commissioner's assessment of the "user fee" constitutes the "taking" of private property of the plaintiff class members for public use, without just compensation, in violation of the "takings clause" of the Fifth Amendment to the United States Constitution; the plaintiffs therefore seek appropriate monetary damages and declaratory and injunctive relief. Finally, in their Fifth Claim for Relief—the "FOIA claim"— brought pursuant to 5 U.S.C. § 553 and 28 U.S.C. § 1361, the plaintiffs alleged that the Commissioner had failed and refused to respond to the January 24, 2001, FOIA request by NOSSCR's Executive Director for a copy of the "work sampling and management information data" referred to in the Commissioner's notice of January 19, 2001, which set out the "user fee" for 2001; the plaintiffs therefore sought an order compelling the Commissioner to respond to the FOIA request. However, the plaintiffs also agree that this claim has been mooted by the Commissioner's response to their FOIA request. The defendants jointly answered the Complaint on July 2, 2001.

## 2. The parties' motions

### a. The defendants' motion for summary judgment and judgment on the pleadings

On August 20, 2001, the Commissioner and the Comptroller General jointly moved for summary judgment and judgment on the pleadings, challenging all of the plaintiffs' claims. Somewhat more specifically, they argue that they are entitled to judgment on the pleadings on the plaintiffs' "mandamus claim," because that claim was mooted by the GAO's submission of the report required by the "Ticket to Work Act," and because the plaintiffs lack standing to challenge the GAO's previous failure to issue the study and report. They also seek judgment on the pleadings on the plaintiffs' "FOIA claim" on the grounds that the plaintiffs failed to exhaust administrative remedies under the FOIA and the claim is now moot, because the SSA has produced all of the requested information. The defendants also seek summary judgment on the plaintiffs' remaining three claims. They contend that the plaintiffs cannot obtain monetary relief on their " 'Little Tucker Act' claim," because there is no underlying statutory provision providing for damages, and more specifically, that 42 U.S.C. § 406(d) does not provide for such damages. The defendants also seek summary judgment on the plaintiffs' "APA claim" on the ground that, as a matter of law, the SSA's calculation of the 2001 "user fee" was not arbitrary and capricious in light of the methodology used to determine the costs to the SSA of administering the attorney fee process, the ratio between those costs and attorney fee awards, and the statutory cap on the "user fee." Finally, the defendants argue that they are entitled to summary judgment on the plaintiffs' "takings claim," because the burden imposed by the "user fee" is a fair approximation of the costs of the benefits supplied by the SSA's attorney fee certification and payment process, and thus cannot be an unconstitutional "taking" under the Fifth Amendment.

The plaintiffs filed a response to the defendants' motion for summary judgment

and judgment on the pleadings on October 9, 2001. In that response, the plaintiffs conceded that their First and Fifth Claims for Relief, the "mandamus claim" and the "FOIA claim," respectively, are now moot and may be dismissed. Therefore, the court will grant the defendants motion for judgment on the pleadings as to the plaintiffs' "FOIA" and "mandamus" claims. However, the plaintiffs resisted the defendants' motion for summary judgment on their "APA," " 'Little Tucker Act,' " and "takings" claims, and indeed, moved for partial summary judgment in their favor on some of those claims, as explained more fully below.

### b. The plaintiffs' motion to strike

In addition to resisting the defendants' dispositive motion, the plaintiffs filed on October 9, 2001, a separate motion to strike all or portions of declarations offered in support of the defendants' dispositive motion. The plaintiffs argue, first, that the declarations of Ralph J. Smith, Caroline Lott, Wanda S. Walker, Charles Gerber, Barbara D. Bovbjerg, and Darrell Blevins, or portions of their declarations, should be stricken because they are not based upon personal knowledge and contain inadmissible expert opinions. Next, the plaintiffs contend that the declarations of Ralph J. Smith, Wanda J. Walker, and Charles Gerber should be stricken, because they constitute impermissible post hoc rationalizations of agency action. The defendants resisted this motion on November 7, 2001.

### c. The plaintiffs' cross-motion for partial summary judgment

As part of their resistance to the defendants' August 20, 2001, dispositive motion, on October 9, 2001, the plaintiffs included a cross-motion for partial summary judgment. The precise claim or claims on which they seek partial summary judgment, however, is not altogether clear.

In their "Motion for Partial Summary Judgment and Resistance To Defendants' Motion for Summary Judgment," paragraphs 3 through 5 refer to the plaintiffs' "third claim" pursuant to 5 U.S.C. § 702, i.e., their "APA claim." Indeed, paragraph 5 specifically alleges that "[t]here are no genuine issues of material fact as to Plaintiffs' [sic] and Plaintiffs are entitled to judgment as a matter of law on their third claim." Plaintiffs' Motion for Partial Summary Judgment and Resistance To Defendants' Motion for Summary Judgment, ¶ 5. The next paragraph of the plaintiffs' motion and resistance concedes that the plaintiffs' "First and Fifth Claims are now moot and may be dismissed," but states that the plaintiffs "generally" resist the remainder of the defendants' dispositive motion. See id. at ¶ 6. Thus, it appears from the body of the motion that the plaintiffs seek partial summary judgment only on their "APA claim."

However, confusion as to the claim on which the plaintiffs seek partial summary judgment arises from the third and fourth paragraphs of the plaintiffs' prayer for relief, which ask the court to do the following:

> 3. Grant partial summary judgment in favor of Plaintiffs as to their Third Claim, brought under the Takings Clause [sic] and award relief as requested in the Complaint;
>
> 4. Grant partial summary judgment in favor of Plaintiffs as to their Third Claim, brought under the Administrative Procedure Act and award relief as requested in the Complaint.

See id., Prayer, ¶¶ 3–4. Thus, the plaintiffs appear to pray for summary judgment on their "takings claim" as well as their "APA claim." However, the plaintiffs' "takings claim" is their "Fourth Claim for

Relief" in their Complaint, see Complaint, Fourth Claim for Relief, not their "Third Claim," as stated in the prayer, and no specific assertions of grounds for judgment as a matter of law on the "takings claim" can be discerned in the body of the plaintiffs' motion for partial summary judgment and resistance to the defendants' dispositive motion. See Plaintiffs' Motion for Partial Summary Judgment and Resistance To Defendants' Motion for Summary Judgment. Thus, while the prayer to the motion refers to summary judgment on both the "takings claim" and the "APA claim," the reference to the "takings claim," particularly where both the "takings claim" and the "APA claim" are identified as the "Third Claim," is confusing.

The confusion is apparently lifted by reviewing the plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and Resistance to Defendants' Motion for Summary Judgment. In their memorandum, the plaintiffs specifically argue that they "are entitled to summary judgment" on their "fourth claim, Complaint ¶¶ 60–62, founded upon the takings clause of the fifth amendment to the United States Constitution," because "the private property of the plaintiffs has been taken without just compensation." Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and Resistance to Defendants' Motion for Summary Judgment at 5. In their memorandum, the plaintiffs also argue that, if the court finds that the "user fee" is "unfair" and "unconstitutional," then "the Court need not address Plaintiffs' claims under the Little Tucker Act or the Administrative Procedure Act." Id. at 11; see also id. at 11 n. 4. In addition, in their memorandum, the plaintiffs argue that "[t]his Court should not only deny Defendants' Motion for Summary Judgment as it relates to Plaintiffs' APA claim, but should grant Plaintiffs' Motion for Partial Sum-

mary Judgment on this claim." Id. at 27–28.

Thus, it now appears clear that the plaintiffs seek partial summary judgment on both their "takings claim" and their "APA claim." Moreover, the court finds that the defendants have resisted the plaintiffs' motion for partial summary judgment as though the motion sought partial summary judgment on both the "takings" and the "APA" claims, so that the defendants will not be surprised by the court's construction of the plaintiffs' motion for partial summary judgment.

The question of the scope of the plaintiffs' motion for partial summary judgment resolved, the court turns to resolution of the parties' motions. The court heard oral arguments on the dispositive motions and motion to strike on November 28, 2001. At the oral arguments, plaintiffs Parker and NOSSCR were represented by Thomas A. Krause of Max Schott & Associates, P.C., and Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., both of Des Moines, Iowa. Defendants Commissioner of Social Security and Comptroller General of the United States were represented by Peter Robbins of the Department of Justice in Washington, D.C. The oral arguments, like the parties' written submissions, were thoughtful, animated, and of very great assistance to the court in the disposition of this matter.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Because the plaintiffs concede that judgment on the pleadings is appropriate on their "mandamus" and "FOIA" claims, the court need only consider the standards for summary judgment, not the standards for judgment on the pleadings as well. This court has considered in some detail the standards applicable to motions for sum-

mary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394.

### 2. The parties' burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston*, 133 F.3d at 1107; *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has

carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same).

■ "On motion for summary judgment, '[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 728 (8th Cir.2001) (quoting FED. R. CIV. P. 56(e)). Here, the plaintiffs have moved to strike various declarations offered by the defendants in support of their own motion for summary judgment on the ground that the declarations do not present admissible evidence, in that they present post hoc rationalizations for administrative action, and they are not made on personal knowledge. However, the court finds that the present cross-motions for summary judgment can be resolved without reliance on the evidence challenged in the plaintiffs' motion to strike. Therefore, the court will deny the plaintiffs' motion to strike as moot.

### B. The Crux Of The Matter

The court concludes, on the basis of the record and arguments presented, and the governing law, that the crux of the matter in this case is, as the plaintiffs suggest, their "takings claim," although perhaps not for precisely the reasons asserted by the plaintiffs. *See* Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and Resistance to Defendants' Motion for Summary Judgment at 11 & n. 4 (if the court finds that the plaintiffs are entitled to partial summary judgment on the "takings claim," it need not consider the "APA claim" or "'Little Tucker Act' claim"). The court agrees with the plaintiffs that a decision favorable to the plaintiffs on their motion for partial summary judgment on their "takings claim" would obviate the need for the court to consider the other remaining claims. However, by the same token, a decision favorable to the *defendants* on *their* motion for summary judgment on the "takings claim" would also dictate summary judgment on the remaining claims.

For example, if there has been no "taking"—because the 6.3% "user fee" is a fair approximation of SSA's costs of administering the attorney fee determination and payment process for 2001, as the applicable standard for the "takings claim" is

explained more fully herein—then it follows that the "user fee" set by the SSA was not "arbitrary and capricious," because the "user fee" is necessarily also a reasonable determination by the Commissioner of the assessment "necessary in order to achieve full recovery of the costs of determining and certifying the fees to attorneys from the past-due benefits of claimants" or the statutory cap of 6.3 percent, see 42 U.S.C. § 406(d)(2)(B)(ii), and the plaintiffs' "APA claim" must fail. See Central South Dakota Coop. Grazing Dist. v. Secretary of U.S. Dep't of Agric., 266 F.3d 889, 894 (8th Cir.2001) ("Under the APA scheme, we must uphold agency action unless it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'") (quoting Friends of Richards–Gebaur Airport v. FAA, 251 F.3d 1178, 1185 (8th Cir.2001), in turn quoting 5 U.S.C. § 706(2)(A)); see also id. ("A decision is arbitrary and capricious if [']the agency has relied on fac-

tors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'") (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).[6] Similarly, the defendants' success on the "takings claim" would mean that the plaintiffs cannot recoup any damages from an improperly calculated and assessed "user fee" on their " 'Little Tucker Act' claim," because, in such circumstances, as a matter of law, the "user fee" simply would not have been improperly calculated.

Thus, the court's legal analysis begins—and potentially ends—with consideration of the cross-motions for summary judgment on the plaintiffs' "takings claim." Only if the court finds that neither the

6. That is, failure on the "takings claim" necessarily demonstrates the lack of arbitrary and capricious determination of the "user fee" for purposes of the "APA claim" if the administrative record is adequate to support the agency determination. It is at least theoretically possible that the plaintiffs' "takings claim" could fail on the whole record submitted here, but that the administrative record would nevertheless be inadequate to support the agency decision under the APA. Indeed, the plaintiffs contend that the administrative record here is both inadequate and incomplete, because, inter alia, it is only eight pages long even though millions of dollars were at stake. See Defendants' Appendix in Support of Their Motion for Summary Judgment and for Judgment on the Pleadings, Exhibit B (administrative record). The defendants, however, contend that the record is sufficient to support the Commissioner's conclusion that the "user fee" should remain at 6.3% for 2001, because the question is essentially one of accounting, adequately answered with figures and arithmetic, and little discussion.

The court agrees with the defendants that the administrative record, while surprisingly

or even suspiciously sparse, is not legally incomplete, because the plaintiffs have failed to generate a genuine issue of material fact that the administrative record does not include information on some important aspect of the problem. The administrative record explains the method used to collect information, a summary of the information necessary for the pertinent calculations as to two of the major components of the SSA, and a final calculation of the administrative costs of attorney fee processing as a percentage of attorney fees paid, with the caveat that the percentage "should be higher" once additional data from other components is included. See Defendants' Appendix in Support of Their Motion for Summary Judgment and for Judgment on the Pleadings, Exhibit B. Moreover, the administrative record demonstrates that the SSA's estimate of the actual administrative costs was a higher percentage of the attorney fees paid than the SSA was permitted to recover under the "capped" percentage for the "user fee" in 42 U.S.C. § 406(d), which demonstrates the reasonableness of the agency determination of the "user fee" in light of the administrative record.

plaintiffs nor the defendants are entitled to summary judgment on the "takings claim" will it be necessary for the court to consider the merits of summary judgment on the APA and "Little Tucker Act" claims.

## C. The "Takings Claim"

### 1. Arguments of the parties

As summarized above, the defendants assert that they are entitled to summary judgment on the plaintiffs' "takings claim," because, as a matter of law, the burden imposed by the "user fee" is a fair approximation of the costs of the benefits supplied by the SSA's attorney fee certification and payment process. In support of this argument, the defendants rely, *inter alia,* on the Supreme Court's decision in *United States v. Sperry Corp.,* 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), which they identify as "controlling here." *See* Defendants Memorandum in Support of Defendants' Motion for Summary Judgment and Judgment on the Pleadings at 19–21. They argue that, as in *Sperry,* the statute authorizing the "user fee" in this case unequivocally provides that the purpose of the "user fee" is to reimburse the government for the costs of its services in determining, collecting, and paying attorney fees, even if the funds are paid into the claimant's trust fund, because *Sperry* does not require that a "user fee" for reimbursement of government costs must necessarily be paid into a separate fund to pay such costs. They contend further that the "user fee" is imposed only on those persons who use the service, the attorneys who receive payment of attorney fees through the SSA. They argue that the "user fee" itself is far from excessive; indeed, for 2001, they point out that the "user fee" has been "capped" at well below the actual costs to the SSA of certifying and determining attorney fee payments. Furthermore, they point out that, while the GAO did not adopt all of the SSA's

cost estimates, the GAO nevertheless determined that the administrative costs to the SSA exceed the statutory cap on the "user fee." They also argue that the statutory mandate did not require the SSA to determine the precise administrative costs of the service, but only to determine whether those costs exceed what can be recovered by the capped "user fee." They also argue that the "user fee" here is not a "taking" of the entire attorney fee award, not a "taking" of the entire amount of the funds at issue, as in the cases involving appropriation for a public purpose of the interest on lawyer trust accounts (IOLTA). Thus, they contend that there is no genuine issue of material fact that the "user fee" is a "fair approximation of the costs of benefits supplied," *see Sperry,* 493 U.S. at 60, 110 S.Ct. 387—and indeed, the undisputed facts show that the "user fee" at the capped percentage *undercharges* for the costs of the service—and that, therefore, this is not "a situation where the government has appropriated all, or most of the award to itself and labeled the booty as a user fee," because the statutory cap on the "user fee" prevents such an excessive appropriation. *Id.* at 62, 110 S.Ct. 387.

The plaintiffs, however, argue that *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), one of the "IOLTA cases," not *Sperry,* "is on point and controlling authority" in this case, but the defendants did not cite it. *See* Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and Resistance to Defendants' Motion for Summary Judgment at 6. The plaintiffs argue that, contrary to the defendants' assertions, *Phillips* establishes that they have a protected property interest in money. They attempt to distinguish *Sperry* on the grounds that, in *Sperry,* Congress made clear that the "user fee" was to reimburse the United States for the costs of the Iran–United States

Claims Tribunal, while the funds here are meant to finance the continued disability benefits to individuals under the "Ticket to Work Act." They assert that the funds collected by the "user fee" are not used either to defray administrative costs or to improve the efficiency of the attorney fee processing system, but are paid into the claimants' trust funds. Thus, they argue that an essential "nexus" between the exaction and a permissible purpose for a "user fee" in *Sperry* is missing here. Instead, they contend that the "user fee" here is a "forced contribution" to general government revenues, but claimants' attorneys should not be called upon to bear a disproportionate share of the costs of the "Ticket to Work Act." They also argue that the 6.3% "user fee" in this case is distinguishable from the 1.5% "user fee" in *Sperry*, because the "user fee" in this case is more than four times higher, and Congress had anticipated that the "user fee" at issue here would decrease, not increase. In short, the plaintiffs argue that the "user fee" here is distinguishable from the one in *Sperry*, because it is simply unfair, and it is not a fair approximation of the costs of the benefits supplied, where the fee payment system is antiquated and inefficient, and thus unnecessarily expensive, and subject to excessive delays.

### 2. The controlling authority

As mentioned above, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Rouse,* 193 F.3d at 939; *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. Therefore, the court must begin by determining the "governing law" for the plaintiffs' "takings claim" where the parties dispute what Supreme Court decision is controlling.

The plaintiffs contend that *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), is "controlling" here. In *Phillips,* the Supreme Court considered "whether interest earned on client funds held in IOLTA accounts [*i.e.,* attorney trust accounts] is 'private property' of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment." *Phillips,* 524 U.S. at 160, 118 S.Ct. 1925. The court "h[e]ld that the interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal." *Id.* at 172, 118 S.Ct. 1925. However, the Court "express[ed] no view as to whether these funds have been 'taken' by the State; nor [did the Court] express an opinion as to the amount of 'just compensation,' if any, due respondents." *Id.*[7] Furthermore, the Court explained,

> This would be a different case if the interest income generated by IOLTA ac-

---

7. On remand, the lower courts reached the question not decided by the Supreme Court of whether or not there had been a "taking." The district court found that there was neither a "taking" nor a compensable loss. *See Washington Legal Found. v. Texas Equal Access to Justice Found.,* 86 F.Supp.2d 624 (W.D.Tex.2000). However, on further appeal, a panel of the Fifth Circuit Court of Appeals reversed and remanded the district court's decision, finding that the IOLTA program was a *per se* "taking" under the Takings Clause and that declaratory and injunctive relief were available. *See Washington Legal Found.*

*v. Texas Equal Access to Justice Found.,* 270 F.3d 180 (5th Cir.2001). On the other hand, in a still more recent decision in the wake of the Supreme Court's decision in *Phillips,* the Ninth Circuit Court of Appeals, *en banc,* held that the IOLTA program was *not* a "taking" of the clients' property in violation of the Fifth Amendment, and that, even if it was a "taking," there would be no Fifth Amendment violation, because the value of the clients' just compensation is nil. *See Washington Legal Found. v. Legal Found. of Washington,* 271 F.3d 835 (9th Cir.2001) (*en banc* ); *but see id.*

counts was transferred to the State as payment "for services rendered" by the State. [*Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) ]; cf. *United States v. Sperry Corp.,* 493 U.S. 52, 60, 110 S.Ct. 387, 393–394, 107 L.Ed.2d 290 (1989) (upholding the imposition of a "reasonable 'user fee' " on those utilizing the Iran–United States Claims Tribunal). But here the State does not, indeed cannot, argue that its confiscation of respondents' interest income amounts to a fee for services performed. Unlike in *Webb's,* where the State safeguarded and invested the deposited funds, funds held in IOLTA accounts are managed entirely by banks and private attorneys.

*Phillips,* 524 U.S. at 171, 118 S.Ct. 1925. Thus, while interesting, *Phillips* is hardly controlling here, where the present case does not involve appropriation of interest on funds, *cf. id.* at 160 & 172, 118 S.Ct. 1925, but a deduction from funds as a "user fee," and the question on the plaintiffs' "takings claim" is precisely whether or not the "user fee" constitutes a "taking." *Cf. id.* at 171, 118 S.Ct. 1925 (expressly not reaching the question of whether there had been a "taking"). Moreover, as the quotation above demonstrates, the Court in *Phillips* expressly distinguished its holding from cases considering what constitutes a permissible "user fee"—which is the kind of case presented here—citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), and *United States v. Sperry Corp.,* 493 U.S. 52, 60, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), *see id.* at 171, 118 S.Ct. 1925,

which are the decisions upon which this court relies below.

Contrary to the plaintiffs' assertions, the court finds that the primary controlling authority here is, as defendants argue, *United States v. Sperry Corporation,* 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). In *Sperry,* the Court considered whether a statute that "requires the Federal Reserve Bank of New York to deduct and pay into the United States Treasury a percentage of any award made by the Iran–United States Claims Tribunal in favor of an American claimant before remitting the award to the claimant . . . violates the Just Compensation Clause . . . of the Fifth Amendment." *Sperry Corp.,* 493 U.S. at 54, 110 S.Ct. 387.[8] Also, in *Sperry,* Justice White, writing for a unanimous Court, identified the "heart of the dispute" as Sperry's contention that a 1.5% deduction from its award authorized by the statute in question was an unconstitutional "taking." *See id.* at 57–58, 110 S.Ct. 387. Thus, not only did the statute at issue in *Sperry* impose a "user fee" on prevailing claimants that is analogous to the "user fee" at issue here, but the Court addressed the precise question at issue here, which is whether or not the challenged "user fee" constitutes a "taking."

### 3. Analysis in light of controlling authority

#### a. Purpose of the "user fee"

■ In *Sperry,* the Court concluded that "Sperry has not identified any of its property that was taken without just compensation." *Id.* at 59, 110 S.Ct. 387. The Court's reasoning began as follows:

at 864–67 (Kozinski, J., joined by Trott, Kleinfeld, and Silverman, JJ., dissenting).

**8.** In addition to a challenge under the "takings" or "just compensation" clause, the *Sper-*

*ry* decision involved challenges under the "due process clause" of the Fifth Amendment and the "origination clause" of Article I, § 7, of the United States Constitution.

Section 502(a) [50 U.S.C. § 1701(a)] specifically states that the deductions are made as "reimbursement to the United States Government for expenses incurred in connection with the arbitration of claims of United States claimants against Iran before [the] Tribunal and the maintenance of the Security Account...." Given especially this specific declaration by Congress that the deductions are intended to reimburse costs incurred by the United States, the burden must lie with Sperry to demonstrate that the reality of § 502 belies its express language before we conclude that the deductions are actually takings. *Cf. Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 375–376, 94 S.Ct. 2291, 2295–2296, 41 L.Ed.2d 132 (1974). That burden has not been met.

*Sperry*, 493 U.S. at 60, 110 S.Ct. 387. In this case, notwithstanding the plaintiffs' contentions that § 406(d) is designed to finance continued disability benefits to individuals under the "Ticket to Work Act," this court finds that § 406(d) expressly states that the purpose of the "user fee" is "to achieve full recovery of the costs of determining and certifying the fees to attorneys from the past-due benefits of claimants." 42 U.S.C. § 406(d)(2)(B). Thus, like the statute at issue in *Sperry*, the statute authorizing the "user fee" here expressly states that the purpose of the deduction is to reimburse the SSA for the costs of its services. Therefore, as in *Sperry*, "[g]iven especially this specific declaration by Congress that the deductions are intended to reimburse costs incurred by the United States, the burden must lie with [the plaintiffs] to demonstrate that the reality of [§ 406(d)] belies its express language before [this court can] conclude that the deductions are actually takings." *Sperry*, 493 U.S. at 60, 110 S.Ct. 387.

**b. Does reality belie the stated purpose?**

█ **i. Are the "user fees" used to pay costs or benefits?** The plaintiffs contend that, notwithstanding that § 406(d) provides that the "user fee" is "to achieve full recovery of the costs of determining and certifying the fees to attorneys," 42 U.S.C. § 406(d)(2)(B), the "reality of [§ 406(d)] belies its express language," *see Sperry*, 493 U.S. at 60, 110 S.Ct. 387, because the "user fees" collected are used to pay claimants' benefits, not to defray administrative costs of the attorney fee collection and payment process or to improve the fee processing system. The plaintiffs argue that if the "user fee" is not specifically used to pay administrative costs of attorney fee processing, the "user fee" is just a "forced contribution to general governmental revenues." In contrast, the defendants argue that the fund into which the "user fees" are credited is not legally significant. The defendants suggest that it is up to the sovereign to determine how funds recouped by a "user fee" are ultimately spent, as long as the "user fee" is "a fair approximation of the costs of the benefits supplied." *Sperry*, 493 U.S. at 60, 110 S.Ct. 387.

Certainly, under *Sperry*, there is no requirement that a "user fee" be paid into a fund specifically ear-marked for payment of the administrative costs that the "user fee" was intended to reimburse. *See Sperry*, 493 U.S. at 54, 110 S.Ct. 387 (the "user fee" collected to reimburse the United States for its costs in connection with the Iran–United States Claims Tribunal were paid into the United States Treasury). However, that does not end the matter. In *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), the Supreme Court considered whether there had been an unconstitutional "taking" where a county

"t[ook] as its own, under the authority of a state statute, the interest accruing on an interpleader fund deposited in the registry of the county court." *See Webb's*, 449 U.S. at 155, 101 S.Ct. 446. The Court concluded that there had been an unconstitutional "taking":

> This Court has been permissive in upholding governmental action that may deny the property owner of some beneficial use of his property or that may restrict the owner's full exploitation of the property, if such public action is justified as promoting the general welfare. *See, e.g., Andrus v. Allard,* 444 U.S. [51,] 64–68, 100 S.Ct. [318,] 326–328, 62 L.Ed.2d 210 [ (1979) ]; *Penn Central Transportation Co. v. New York City,* 438 U.S. [104,] 125–129, 98 S.Ct. [2646,] 2660–2662, 57 L.Ed.2d 631 [ (1978) ].

> Here, however, Seminole County has not merely "adjust[ed] the benefits and burdens of economic life to promote the common good." *Id.,* at 124, 98 S.Ct. at 2659. Rather, *the exaction is a forced contribution to general governmental revenues, and it is not reasonably related to the costs of using the courts.* Indeed, "[t]he Fifth Amendment's guarantee ... was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

*Webb's,* 449 U.S. at 163, 101 S.Ct. 446 (emphasis added). In *Webb's,* the Court concluded that the county could not justify its retention of the interest on the ground that it was a "fee for services," because "any services obligation to the county was paid for and satisfied by the substantial fee charged pursuant to [another statute] and described specifically in that statute as a fee 'for services' by the clerk's office." *Id.* at 162, 101 S.Ct. 446. The statute permitting retention of interest, "in contrast, in no way relates the interest of which it speaks to 'services rendered.' " *Id.* Thus, the decision in *Webb's* does support the plaintiffs' contention about the use made of the retained funds to the extent that, if a governmental entity retains funds without relating the retention to "services rendered," the retention may be an unconstitutional "taking," because it is "a forced contribution to general governmental revenues." *Id.* at 163, 101 S.Ct. 446.

However, three matters were critical to the holding in *Webb's:* (1) no justification for the retention of the interest by the county was stated in the challenged statute; (2) another statutory provision, the constitutionality of which was not challenged, already provided for a "user fee" to reimburse the county for the costs of managing the interpleader funds; and (3) the exaction was "not reasonably related to the costs of using the courts," *i.e.,* using the service in question. *See id.* at 162–63, 101 S.Ct. 446. In contrast, in the case presently before this case, the challenged statute, § 406(d), is purportedly the authorization for the "user fee" itself. Moreover, the statute at issue here specifically justifies the "user fee" as a fee for "services rendered": Under the statute, the Commissioner is to retain sufficient of the attorney fees "to achieve full recovery of the costs of determining and certifying the fees to attorneys from the past-due benefits of claimants" or the statutory cap of 6.3 percent. *See* 42 U.S.C. § 406(d)(2)(B)(ii).

Although the plaintiffs are correct that § 406(d)(5) provides that "[a]ssessments on attorneys collected under this subsection shall be credited to the Federal Old–Age and Survivors Insurance Trust Fund and the Federal Disability Insurance Trust

Fund, as appropriate," 42 U.S.C. § 406(d)(5), and thus, the fees collected are credited to the funds that pay claimants' benefits, that does not mean that the fees collected are used to pay claimants' benefits instead of the costs of services rendered. Rather, § 406(d)(6) provides as follows:

> The assessments authorized under this section shall be collected and available for obligation only to the extent and in the amount provided in advance in appropriate Acts. *Amounts so appropriated are authorized to remain available until expended, for administrative expenses in carrying out this subchapter and related laws.*

42 U.S.C. § 406(d)(6) (emphasis added); *see also* 42 U.S.C. § 401(g)(1)(B) (providing that, at the end of each fiscal year, the Commissioner shall determine what portion of administrative costs are properly borne by each of the trust funds and the general fund of the Treasury, and necessary transfers are then effected). Thus, the "user fees" collected pursuant to § 406(d) are in fact used to pay administrative expenses, and the nexus between the assessments and the costs the assessments were supposed to reimburse does exist in this case. *Cf. Sperry*, 493 U.S. at 60, 110 S.Ct. 387 (the "user fee" was collected to pay the costs of the tribunal); *Webb's*, 449 U.S. at 162, 101 S.Ct. 446 (considering whether the retention of interest was justified as a fee for services rendered).

***ii. Is the "user fee" reasonably related to or a fair approximation of costs?*** Because the "user fees" at issue here are in fact used to pay administrative expenses, the dispositive question in this case, as formulated in *Webb's*, is whether the "user fee" is "reasonably related to the costs of using" the attorney fee processing services of the SSA. *See Webb's*, 449 U.S.

at 163, 101 S.Ct. 446. If it is, the "user fee" is not just a "forced contribution to general governmental revenues." *Cf. id.* The court sees no difference between the standard as stated in *Webb's, i.e.,* whether the exaction is "reasonably related to the costs of using" the service in question, and the standard in *Sperry,* which is whether the "user fee" is a " 'fair approximation of the costs of benefits supplied.' " *Sperry*, 493 U.S. at 60, 110 S.Ct. 387 (quoting *Massachusetts v. United States*, 435 U.S. 444, 463, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978)).

■ Like the plaintiff in *Sperry,* the plaintiffs here contend that the SSA has not produced sufficient, unassailable evidence of the costs—or what might be the reasonable costs—of its attorney fee processing to establish that the "user fee" is reasonably related to the costs of the services in question or is a fair approximation of the costs of the benefits supplied. This court rejects this argument, as did the Court in *Sperry:*

> This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services. Nor does the Government need to record invoices and billable hours to justify the cost of its services. All that we have required is that the user fee be a "fair approximation of the cost of benefits supplied." *Massachusetts v. United States,* 435 U.S. 444, 463, n. 19, 98 S.Ct. 1153, 1165, n. 19, 55 L.Ed.2d 403 (1978).

*Sperry*, 493 U.S. at 60, 110 S.Ct. 387. Notwithstanding the plaintiffs' arguments about the inadequacies in the SSA's calculation of its administrative costs, there are no genuine issues of material fact that the "user fee" at issue here is indeed a "fair approximation of the cost of the benefits supplied," *id.,* or "reasonably related to the costs of using the [service]." *See Webb's,*

449 U.S. at 163, 101 S.Ct. 446. Even generously discounting the costs estimated by the SSA, the GAO, in an independent report, concluded that the "lower bound" for the estimated administrative costs of attorney fee processing was "$35.4 million, or about 6.9 percent of total attorney fees, exceeding the 6.3 percent threshold of the user fee." Plaintiffs' Appendix at 34–35 (GAO Report at 2–3 ("Results in Brief")). Thus, the "user fee" at issue here is indeed a "fair approximation of the cost of the benefits supplied," as determined by both the SSA and an independent agency.

***iii. Is Sperry otherwise distinguishable?*** Nor is the court persuaded by the plaintiffs' attempt to distinguish the 6.3% "user fee" here from the 1.5% "user fee" at issue in *Sperry* on the ground that the fee at issue here is four times as high. As the Court explained in *Sperry*,

> The deductions authorized by § 502 are not so clearly excessive as to belie their purported character as user fees. This is not a situation where the Government has appropriated all, or most, of the award to itself and labeled the booty as a user fee. *Cf. FCC v. Florida Power Corp.*, 480 U.S. 245, 253, 107 S.Ct. 1107, 1113, 94 L.Ed.2d 282 (1987); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980). We need not state what percentage of the award would be too great a take to qualify as a user fee, for we are convinced that on the facts of this case, 1½ % does not qualify as a "taking" by any standard of excessiveness. This was obviously the judgment of Congress and we abide by it.

*Sperry*, 493 U.S. at 62, 110 S.Ct. 387 (footnotes omitted). Similarly here, the appro-priation of only 6.3% of the attorney fee as a "user fee" does not constitute a situation in which "the Government has appropriat-ed all, or most, of the award to itself and labeled the booty as a user fee." *Id.* As in *Sperry*, this court "need not state what percentage of the [attorney fee] award would be too great a take to qualify as a user fee, for [this court is] convinced that on the facts of this case, [6.3%] does not qualify as a 'taking' by any standard of excessiveness." *Id.* This is so, because the "user fee" does not exceed the actual ad-ministrative costs of the attorney fee pro-cessing as determined by the GAO's "low-er bound" method, and according to either the GAO's or the SSA's estimates, the "user fee," if anything, undercharges attor-neys for the reasonable costs of the service provided.[9] Moreover, the 6.3% "user fee" does not exceed the statutory cap imposed by Congress, *see* 42 U.S.C. § 406(d)(2)(B)(ii), so that the "user fee" does not exceed what "was obviously the judgment of Congress" as to a reasonable "user fee," and this court, like the Su-preme Court in *Sperry*, abides by Con-gress's judgment in this regard. *Sperry*, 493 U.S. at 62, 110 S.Ct. 387.

Similarly unavailing is the plaintiffs' ar-gument that "the United States has taken [their] property by charging [them] for the use of procedures that [they] ha[ve] been forced to use, or at least that [they] would rather not have used," *see id.* at 63, 110 S.Ct. 387, because, for example, the SSA's attorney fee processing is antiquated, inef-ficient, slow, and excessively costly. As the Court explained in *Sperry*, "a reason-able user fee is not a taking if it is imposed for the reimbursement of the costs of gov-ernment services," *id.*, which it plainly is in

---

**9.** This is true using either the SSA's estimates reflected in the administrative record or the SSA's estimates identified in the GAO Report. Thus, the conclusion is the same based on the administrative record, for purposes of the "APA claim," or the entire record presented here, for purposes of the "takings claim."

this case. The standard is *not* whether the "user fee" is imposed for the reimbursement of the *fair and reasonable* costs of government services. *Cf. id.* While the court is sympathetic to the plaintiffs' complaints that the processing of attorney fees by the SSA could be faster, more efficient, and less expensive—and the GAO Report, in particular, bears out those complaints— those complaints are matters for Congress to remedy, not this court, at least not pursuant to any of the claims asserted in this action. Although the plaintiffs argue that the "user fee" is particularly excessive in the case of approval of fee agreements, which should be simple and straight-forward, this argument is also unpersuasive. If the claimant "may be required to pay a charge for the availability of [a] Tribunal even if it never actually used the Tribunal," because the claimant "received the 'benefit from [the Tribunal] in the sense that the services are available for [its] use,'" *see id.* at 63, 110 S.Ct. 387, then a claimant can certainly be charged a "user fee" for the availability of the processing and direct payment of attorney fees pursuant to fee agreements, because the service was not only available, but used. As in *Sperry*, this court concludes that the SSA's attorney fee processing "made available to claimants such as [the plaintiffs here] sufficient benefits to justify the imposition of a reasonable user fee." *Id.* at 64, 110 S.Ct. 387.

Therefore, as a matter of law, the plaintiffs have failed to carry their burden "to demonstrate that the reality of [§ 406(d) ] belies its express language." *Sperry*, 493 U.S. at 60, 110 S.Ct. 387. As a matter of law, the "user fee" in question here is used to pay administrative costs, the "user fee" is "reasonable," because it is a fair approximation of the cost of the benefits supplied, and the SSA made available to the plaintiffs sufficient benefits, in the form of attorney fee processing services, to justify

imposition of that reasonable user fee. Thus, the "user fee" at issue here does not amount to an unconstitutional "taking" without just compensation. Consequently, the defendants are entitled to summary judgment on the plaintiffs' Fourth Claim For Relief. As explained above, disposition of the plaintiffs' "takings" claim is also dispositive of their other remaining claims.

## III. CONCLUSION

On the key issue in this case, the court concludes that, as a matter of law, the "user fee" imposed by 42 U.S.C. § 406(d) does not amount to an unconstitutional "taking." The "user fee" is instead a "fair approximation of the cost of the benefits supplied" by the SSA's attorney fee processing and payment services. For essentially the same reasons, the defendants are entitled to summary judgment on the plaintiffs' "APA claim" in their Third Claim For Relief, and the plaintiffs' " 'Little Tucker Act' claim" in their Second Claim For Relief. Where the "user fee" is a "fair approximation of the costs of the benefits supplied," it is not, as a matter of law, an illegal or excessive exaction, and the plaintiffs' " 'Little Tucker Act' claim" must fail. Similarly, where the "user fee" is a "fair approximation of the cost of the benefits supplied," it is not, as a matter of law, arbitrary and capricious, and the plaintiffs' "APA claim" based on the substance of the decision must fail. Moreover, because the court concludes that the record upon which the SSA determination of the "user fee" was based was not incomplete or insufficient, the plaintiffs' second basis for asserting that the SSA's determination was arbitrary and capricious also fails. In making these determinations, the court has not relied upon any of the evidence challenged in the plaintiffs' motion to strike, rendering that motion moot.

THEREFORE,

1. The plaintiffs' motion to strike is **denied as moot**.

2. The defendants' August 20, 2001, motion for summary judgment and judgment on the pleadings is **granted** as to all of the claims for relief in the plaintiffs' Complaint.

3. The plaintiffs' October 9, 2001, cross-motion for partial summary judgment is **denied**.

4. The plaintiffs' Complaint is dismissed in its entirety. Judgment shall enter accordingly.

**IT IS SO ORDERED.**